2020

CAROLINA AMUSEMENT COMPANY, INC., Appellant v. CONNECTICUT NATIONAL LIFE INSURANCE COMPANY, f/k/a Covenant Life Insurance Company, Respondent.

(437 S.E. (2d) 122)

Court of Appeals

*Steven E. Harvey* of *Isaacs, Alley & Harvey*, Columbia, *for* appellant.

*Douglas McKay, Jr.* and *Glenn Ohanesian* of *McKay, McKay, Henry & Foster*, Columbia, *for respondent.*

Heard April 13, 1993. Decided June 1, 1993.

Refiled Aug. 2, 1993. Cert. Den. Nov. 2, 1993.

## ORDER

*Per Curiam:*

After reviewing the Petition for Rehearing in this case, it is ordered that the opinion heretofore filed, Opinion No. 2020, filed June 1, 1993, be withdrawn and the attached opinion be substituted. The Petition for Rehearing is denied.

AND IT IS SO ORDERED.

CURETON, Justice:

Carolina Amusement Company, Inc. (Carolina Amusement) is the named beneficiary under a life insurance policy issued

by Connecticut National Life Insurance Company (Insurer) covering the life of the decedent, Joel Hendrix.[1] The dispositive issue on appeal is whether a letter sent by the Insurer to Hendrix in December 1984 constitutes a separate insurance contract for the amount of $31,200. The trial court held it did not. Carolina Amusement appeals. We affirm.

The facts in this case are undisputed. On August 23, 1981, Hendrix applied to Covenant Life Insurance Co. (Covenant), the predecessor of the Insurer, for a whole life insurance policy in the face amount of $100,000. The next day Hendrix executed to First Palmetto State Bank & Trust Co. (Bank) an assignment of the policy as collateral for a loan. Pursuant to the application and assignment, Covenant issued a policy on September 14, 1981, with annual premiums due each anniversary date.

The pertinent terms of the policy include: (1) a table of values attached to the policy that states the policy has a cash value of $1,300 and would purchase $4,400 in paid-up insurance after its third anniversary date; (2) five conditions for reinstatement of a lapsed policy, including proof of insurability; and (3) nonforfeiture options which provide that in case of default in the payment of premiums, the insured may choose to a) surrender the policy for cash, b) continue the policy as paid-up insurance, or c) continue the policy as extended-term insurance.[2]

The second nonforfeiture option provides that if the insured elects paid-up insurance, the amount "depends on how much single premium insurance the cash value of the Policy ... will buy when applied as a net single premium." The nonforfeiture provisions further provide that the insured shall have "60 days after the due date of the first unpaid premium" to make an election of one of these options. They also state:

> If you do not choose by the end of the 60 day period, we will *automatically* continue the Policy as extended term

---

[1] Hendrix was president of Carolina Amusement.

[2] These provisions, and the requirement that the insured shall have 60 days to elect a settlement option after default in the payment of premiums, must be inserted into all life insurance policies. S.C. Code Ann. § 38-63-520(3) (1976) as amended. The table of values attached to the policy indicates extended term insurance is not available.

insurance. If extended term insurance is not available because the Insured is not in a standard premium class, we will [automatically] continue the Policy as paid-up insurance. (Emphasis added.)

Hendrix did not pay the premium due on September 14, 1984. On December 3, 1984, Kathleen A. Ruffino, Covenant's customer relations officer, wrote to Hendrix stating:

The status of your policy has changed because the premium due 9/14/84 was not paid. In accordance with the terms and conditions of the policy, the cash surrender value on the premium due date has been applied to purchase fully paid-up insurance.

The cash surrender value of $1,300.00 has been applied to purchase paid-up insurance in the amount of $31,200.00. This amount will continue in force unless the policy is reinstated.

It has been our experience that, if reinstatement is not desired, most policyholders prefer to accept the cash surrender value instead of a paid-up policy with a small amount of insurance. Should you decide not to apply for reinstatement of the policy and do not wish to retain the paid-up policy, please complete the enclosed Request for Cash Surrender form. We will be happy to send you the cash surrender value promptly.

Reinstatement is possible only in accordance with the terms and conditions of the policy. Should you desire any further information regarding the status of this policy, or if you wish to apply for reinstatement, please contact us.

Hendrix did not contact Covenant. On May 28, 1985, while the paid-up policy was in force, Hendrix died.

On June 10, 1985, the Insurer wrote to Mrs. Hendrix advising her that the $1,300 cash value was insufficient to pay the September 1984 premium due of $3,160. The letter added:

It appears you were inadvertently furnished incorrect information in the December 3, 1984 letter regarding the policy size. Based on the age of the insured and the amount of cash value at the premium due date the amount of paid-up insurance is $2,400.

On June 25, 1985, the Bank wrote to the Insurer and informed it that at the time of Hendrix's death the payoff on his loan was $65,993. The Bank then surrendered the policy and the Insurer sent the Bank a check for $2,426 ($2,400 paid-up insurance plus $26 accumulated interest). The check was negotiated by the Bank.[3]

Carolina Amusement paid Hendrix's debt to the Bank, and then, as beneficiary under the policy, brought this action to collect unpaid monies claiming the letter of December 3, 1984 constituted an offer to provide $31,200 in paid-up insurance in return for the $1,300 cash value retained by the Insurer, which offer was implicitly accepted by Hendrix.

The Insurer presented evidence that because Hendrix suffered from leukemia, it always intended to issue a "substandard" policy and so entered the policy on its computer. Thus, according to the Insurer's records, the $1,300 cash value of the lapsed policy would have bought only $2,400 in paid-up insurance. Although the declaration page of the policy indicates the policy requires a "substandard extra premium" of $1,369 per year, the table of values attached to the policy applied to a standard policy and provided that $1,300 in cash value would purchase $4,400 in paid-up insurance at the end of the third anniversary of the policy.

The Insurer's witness testified the December 3, 1984 letter reflected a "computational error" in stating that the $1,300 cash value could buy $31,200 in paid-up insurance.

The court held the letter of December 3, 1984 was not a new contract but merely an erroneous explanation of the coverage the policy afforded after it lapsed for nonpayment of premiums. It reasoned the mistake as to the amount of paid-up insurance could be readily ascertained by reference to the policy.

The court also held the letter could not modify the terms of the policy because the writer had no authority to do so. The policy provides it was the sole agreement between the parties

---

[3] Connecticut issued two checks: one in July 1985 and another in April 1989. The first check, for $2,426.00 or the amount Connecticut initially asserted was due under the terms of a substandard policy, was sent to the bank on July 18, 1985. The second check, for $2,646.09 and representing the additional amount which Connecticut conceded was due under the terms of the standard policy which it actually had issued, was sent by Connecticut to the bank on April 6, 1989. The latter check has not been negotiated.

and can only be changed by the president, vice president, secretary, or assistant secretary of the company. The writer of the letter was not one of these designated officers. The court further held the letter did not create a new contract because (a) it was not an offer, and (b) if it were, there was no consideration paid for the offer, because the cash surrender value was not new consideration.

In South Carolina, the formation of a contract is governed by well-settled principles. Quite simply, "[a] contract exists where there is an agreement between two or more persons upon sufficient consideration either to do or not to do a particular act." *Benya v. Gamble*, 282 S.C. 624, 628, 321 S.E. (2d) 57, 60 (Ct. App. 1984). Stated another way, there must be an offer and an acceptance accompanied by valuable consideration. *Id.* These principles govern contract formation generally and specifically control the creation of an insurance contract. *Hodge v. National Fidelity Ins. Co.*, 221. S.C. 33, 41, 68 S.E. (2d) 636, 638-39 (1952).

"An offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." *Restatement (Second) of Contracts* § 24 (1981). The offer identifies the bargained for exchange and creates a power of acceptance in the offeree. *Restatement (Second) of Contracts* § 29 (1981); *accord Chang v. First Colonial Sav. Bank*, 242 Va. 388, 410 S.E. (2d) 928, 930-31 (1991).

"Any conduct from which a reasonable person in the offeree's position would be justified in inferring a promise in return for a requested act or a requested promise by the offeree, amounts to an offer." *Broadway v. Jeffers*, 185 S.C. 523, 530-31, 194 S.E. 642, 645 (1938).

We agree with the trial court that the letter of December 3, 1984 did not constitute an offer from Covenant to Hendrix, to provide $31,200 in paid-up insurance in return for the cash value of $1,300. The policy makes it unambiguously clear that upon Hendrix's failure to pay the annual premiums when due, he may within 60 days elect one of three options. It is undisputed that Hendrix did not elect an option. Thus, under the terms of the policy and S.C. Code Ann. § 38-63-520(3), on November 14, 1984, the policy was automatically converted into a paid-up policy in accordance with its terms.

*Dwyer v. Metropolitan Life Ins. Co.*, 132 S.C. 10, 13-14, 129 S.E. 84, 85 (1925); *see* 43 Am. Jur. (2d) *Insurance* § 738 (1982). The fact Hendrix took no affirmative action to elect another option within the 60-day period shows he intended that the automatic provision should operate. 3A John A. Appleman & Jean Appleman, *Insurance Law and Practice* § 1899 (1967).

Consequently, on December 3, 1984, Hendrix had no right to direct how the cash value should be applied. Hendrix's and the Insurer's rights and obligations were fixed. The only legal purpose the letter could have served was to inform Hendrix of the status of the policy. The fact that Covenant may have mis-informed Hendrix of the amount of paid-up insurance in force on December 3, 1984 could not have prejudice him. He had access to the policy and could have discovered the true amount of the insurance. Moreover, and most importantly, he had by that time forfeited his contractual right to receive the cash surrender value. The fact that Covenant gratuitously offered him another opportunity to withdraw the cash value affords him no right that he could have surrendered in return for a $31,200 paid-up insurance policy.[4]

The trial court found, and we agree, it would be unreasonable and unconscionable to hold that the letter which mistakenly explains the status of a lapsed insurance policy formed a new contract. Such an interpretation would unjustly enrich Carolina Amusement and would unreasonably punish the Insurer.

The court also rejected Carolina Amusement's contention that the Insurer should be estopped to deny the letter was a new contract. Carolina Amusement claims the trial court erred because Covenant's agent had authority to modify the terms of the policy by offering more paid-up insurance than the policy afforded and that Hendrix relied upon the representation.

Written contracts may be orally modified by the parties, even if the writing itself prohibits oral modification. *South Carolina Nat'l Bank v. Silks*, 295 S.C. 107, 109, 367 S.E. (2d) 421, 422 (Ct. App. 1988); *Sanchez v. Tilley*, 285 S.C. 449, 452, 330 S.E. (2d) 319, 320 (Ct. App. 1985). Thus,

---

[4] Carolina Amusement does not contend Hendrix was entitled to reinstatement of the policy by virtue of this letter.

the clause limiting the persons who had authority to change the insurance contract would not have, per se, precluded oral modification of the insurance contract.

As pertains to estoppel, a legion of cases holds that to establish equitable estoppel Carolina Amusement must show Hendrix (1) lacked the knowledge and the means of knowledge as to the true amount of paid-up insurance the cash value would purchase, (2) relied upon the Insurer's representation as to the amount the cash value would purchase, and (3) changed his position to his prejudice as a result of such reliance. *Frady v. Smith,* 247 S.C. 353, 359, 147 S.E. (2d) 412, 415 (1966).

We hold that the doctrine of equitable estoppel is inapplicable. On December 3, 1984, Hendrix had no legal right to affect the disposition of the cash value in the policy and, thus, could not have prejudicially changed his position in reliance upon the Insurer's purported offer. Contrary to Carolina Amusement's argument, Hendrix had no legal right to demand payment of the cash value and apply it toward the purchase of other insurance even if he could have obtained other insurance in his then physical condition. Moreover, he had the means of knowledge of ascertaining the true amount of paid-up insurance in force at that time.[5]

Carolina Amusement also argues the Insurer waived any right it had to repudiate the contract created by the December 3rd letter and, regardless of the Insurer's employee's authority to write the December 3rd letter, the Insurer ratified her actions by retaining the cash surrender value. In view of our holding that the December 3rd letter did not create an offer to provide additional insurance, these contentions are meritless. Clearly, while waiver may operate to preclude the repudiation of a contract, it cannot create a contract. *Johnson v. Wabash Life Ins. Co.,* 244 S.C. 95, 100, 135 S.E. (2d) 620, 623 (1964). Moreover, the issue of ratification has never been ruled upon by the trial court and is not an argument this court may consider on appeal. *Green v. Green,* 237 S.C. 424, 438, 117 S.E. (2d) 583, 590 (1960) (an issue

---

[5] The table of values attached to the policy states that at the close of the "Policy Year Ending September 4, 1984," the policy had a cash value of $1,300 and would buy paid-up insurance of $4,400. This plain language requires no interpretation.

is not properly before the appellate court if the record does not disclose the trial judge passed on the issue).

In view of our holding that Carolina Amusement is not entitled to recover on its claim for insurance benefits in accordance with the letter of December 3, 1984, its cause of action for bad-faith refusal to pay the claim must fail. We dispose of this issue pursuant to S.C. Code Ann. § 14-8-250 (1976) as amended, and Rule 220(b)(2), SCACR.

Likewise, we see no need to discuss the Insurer's additional bases for affirming the trial judge.

Affirmed.

SHAW and GOOLSBY, JJ., concur.